#27232-a-DG
**2015 S.D. 54**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GRANT COUNTY CONCERNED
CITIZENS and TIMOTHY A. TYLER,             Plaintiffs and Appellants,

     v.

GRANT COUNTY BOARD OF
ADJUSTMENT, THOMAS ADLER,
LORELEI BRANDT, DAVID FORRETTE,
RICHARD HANSEN, NANCY JOHNSON,
GARY LINDEMAN, DOUG STENGEL,
GEOFF STREET, and TETON, LLC,             Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA
\* \* \* \*
THE HONORABLE ROBERT L. TIMM
Judge
\* \* \* \*

MITCHELL A. PETERSON of
Davenport, Evans, Hurwitz
  & Smith, LLP
Sioux Falls, South Dakota             Attorneys for plaintiffs
                                      and appellants.

ZACHARY W. PETERSON
JACK H. HIEB of
Richardson, Wyly, Wise, Sauck
  & Hieb, LLP
Aberdeen, South Dakota             Attorneys for defendants
                                   and appellees Grant County
                                   Board of Adjustment and its
                                   individual members.

JAMES S. SIMKO of
Cadwell, Sanford, Deibert & Garry, LLP
Sioux Falls, South Dakota             Attorneys for defendant and
                                      appellee Teton, LLC.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 26, 2015
OPINION FILED **06/24/15**

#27232

GILBERTSON, Chief Justice

[¶1.] Grant County Concerned Citizens (GCCC) and Timothy A. Tyler (Tyler) appeal the circuit court's affirmance of the Grant County Board of Adjustment's[1] (the Board) decision to approve Teton LLC's application for a conditional use permit to construct a concentrated animal feeding operation (CAFO). GCCC[2] asserts that Teton's proposed project violates the Zoning Ordinance for Grant County (the ZOGC) and that, consequently, the Board's decision was illegal. GCCC also appeals the circuit court's order striking Tyler's affidavit from the record. We affirm.

## Facts and Procedural History

[¶2.] On December 18, 2012, Teton filed an application with the Grant County zoning officer for a conditional use permit to construct and operate a Class A CAFO in Grant County. In the application, which was available for public review, Teton indicated that the CAFO would house 6,616 swine larger than 55 pounds (referred to as "finisher" swine in the ZOGC) and 1,200 swine smaller than 55 pounds (referred to as "nursery" swine in the ZOGC).

[¶3.] The Board scheduled a hearing for January 14, 2013, to consider Teton's application. In compliance with section 504(2) of the ZOGC, Grant County's zoning officer published notice of the hearing "once ten (10) days prior to the hearing in a paper of general circulation in the area affected." The published notice

---

1. The Board's membership consists of the Grant County Planning Commission plus four alternates appointed by the Board of Grant County Commissioners.

2. References in this opinion to GCCC should be understood to include Tyler except where specifically noted otherwise.

mistakenly reversed the number of finisher and nursery swine listed in the application, instead reporting the CAFO would house no more than 6,616 swine smaller than 55 pounds and 1,200 swine larger than 55 pounds. However, the published notice did indicate the correct number of total swine and that the CAFO was categorized as a Class A CAFO—the largest classification, consisting of 2,000 or more "animal units."[3]

[¶4.] The scheduled hearing took place on January 14, 2013. The Board addressed the error in the published notice at the beginning of the hearing, but the record does not indicate that any concerns were raised or objections noted at that time. Approximately 200 people attended the hearing. After Teton presented its information to the Board and answered questions from the Board's members, the Board opened the hearing to public comment. Every member of the public present who wished to comment—whether an opponent or a proponent—was allotted five minutes to speak. Although Teton anticipated using a road jointly maintained by Melrose and Big Stone Townships, it failed to directly notify Melrose Township of the hearing. Nevertheless, at least one individual who spoke at the hearing indicated the Township was aware of the hearing and had discussed the proposed CAFO.

---

3. An "animal unit" is a unit of measurement utilized by the ZOGC in order to uniformly apply the CAFO regulations to varying types of livestock. One head of "feeder or slaughter cattle" equals one animal unit. Finisher swine are 0.4 animal units per head, and nursery swine are 0.1 animal units per head. Thus, 2,000 animal units could consist of 5,000 finisher swine, 20,000 nursery swine, or some combination thereof.

[¶5.]        Opponents of the application, including Kathy Tyler (Tyler's wife) and other members of GCCC, raised several substantive concerns with Teton's application. Mrs. Tyler informed the Board that if Teton's application was approved, the CAFO would be located—in violation of the ZOGC—within 2,640 feet of a newly constructed well on the Tyler property. In response, one of Teton's representatives speculated that the Tylers dug the "well" merely to frustrate Teton's application. The record does include a facsimile of a South Dakota water well completion report that indicates the Tylers' excavation was completed on December 18, 2012—the same day Teton submitted its application for the conditional use permit. The facsimile itself was generated on December 19, and the report was completed by the firm that dug the excavation. Although the excavation produced 12 gallons of water on December 18, the report does not indicate when the excavation began or how long it was in operation before producing the 12 gallons.

[¶6.]        GCCC also asserted a number of other deficiencies in Teton's application. GCCC claimed Teton's manure management and operation plan identified an insufficient number of acres for the disposal of manure produced by the CAFO. It further claimed Teton "failed to demonstrate the ability to obtain [sufficient] amounts of water from Grant–Roberts Rural Water System." GCCC also alleged Teton misrepresented: that independent farmers were involved with the CAFO, that the principals of the CAFO operating entity had no stake in the CAFO venture, and that the proposed site is located in a sparsely populated area. Finally, GCCC raised a number of environmental and economic concerns. The

Board ultimately determined that the Tylers' excavation was not a "well" within the meaning of the ZOGC setback requirement and approved Teton's application.

[¶7.] GCCC appealed to the circuit court, which initially held that SDCL chapter 11-2 violated the South Dakota Constitution's Equal Protection Clause by applying de novo review to the appeals of some county decisions on conditional use permits and certiorari review to others. We reversed on appeal, having recently reversed another circuit court decision on the same issue. Under the subsequent certiorari review, the circuit court agreed that the excavation dug on the Tylers' property was not a well within the meaning of the setback because it was dug for the purpose of frustrating the application rather than for obtaining groundwater. The court concluded the Board had jurisdiction over Teton's application and pursued its authority in a regular manner.

[¶8.] Nearly three weeks after the circuit court sent its letter of decision to the parties, but prior to the entry of judgment, GCCC submitted an affidavit signed by Tyler explaining the purpose of the excavation was to obtain water for his horse herd. The Board and Teton moved to strike the affidavit from the record. The circuit court granted the motion.

[¶9.] GCCC appeals, raising two issues:

1. Whether the Board regularly pursued its authority in granting Teton's application for a conditional use permit.

2. Whether the circuit court erred in striking Tyler's affidavit.

### Standard of Review

[¶10.] Our review of a board of adjustment's decision is limited. "Any person . . . aggrieved by any decision of the board of adjustment . . . may present to

a court of record a petition . . . setting forth that the decision is illegal, . . . specifying the grounds of the illegality." SDCL 11-2-61. "Upon the presentation of the petition, the court may allow a writ of certiorari directed to the board of adjustment to review the decision . . . ." SDCL 11-2-62. "The review upon writ of certiorari cannot be extended further than to determine whether the . . . board . . . has regularly pursued [its] authority . . . ." SDCL 21-31-8. "With a writ of certiorari, we do not review whether the [board's] decision is right or wrong." *Duffy v. Cir. Ct., 7th Jud. Cir.*, 2004 S.D. 19, ¶ 33, 676 N.W.2d 126, 138. "A board's actions will be sustained unless it did some act forbidden by law or neglected to do some act required by law." *Jensen v. Turner Cnty. Bd. of Adj't*, 2007 S.D. 28, ¶ 4, 730 N.W.2d 411, 413 (quoting *Elliott v. Bd. of Cnty. Comm'rs*, 2005 S.D. 92, ¶ 14, 703 N.W.2d 361, 367).

## Analysis and Decision

[¶11.]    1.    *Whether the Board regularly pursued its authority in granting Teton's application for a conditional use permit.*

[¶12.]    GCCC asserts the Board did not regularly pursue its authority in a number of ways. First, GCCC asserts it presented "indisputable proof" to the Board that a private well existed within the setback distance prohibited by the ZOGC. Second, GCCC asserts Teton's manure management and operation plan did not comply with the ZOGC. Third, GCCC asserts Teton failed to give notice to Melrose Township. Fourth, GCCC asserts Teton's nutrient management plan was deficient. Fifth, GCCC asserts it was denied due process because: (1) it did not receive adequate notice, (2) the Board and the County zoning officer prevented it from making copies of Teton's application, and (3) the Board imposed a five-minutes-per-

person limitation on public comments. Sixth, GCCC asserts the Board's decision was based on fraudulent information. Seventh, and finally, GCCC asserts the Board failed to consider the "environmental, community, and economic impacts Teton's CAFO will have."

*Private well*

[¶13.]        GCCC asserts the ZOGC "unambiguously precluded the Board from granting a [conditional use permit]" to Teton because of the presence of a well within 2,640 feet of the proposed CAFO. Section 1304(6) of the ZOGC generally requires any new CAFO to be at least 2,640 feet away from any private well. The ZOGC does not seem to provide a definition for the word *well*. Instead, GCCC directs us to a definition located in South Dakota's statutes on water rights. SDCL 46-1-6(18) defines *well* as "an artificial excavation or opening in the ground, made by means of digging, boring, drilling, jetting, or by any other artificial method, for the purpose of obtaining groundwater." GCCC asserts that "[t]he Board had before it indisputable proof that there was an artificial opening in the ground, made by means of an artificial method, for the purpose of obtaining groundwater[,] . . . within 2,640 feet of the proposed CAFO." Therefore, GCCC concludes, "the Board arbitrarily and willfully disregarded undisputed proof." Rather than dispute the validity of applying this definition to the ZOGC, the Board and Teton instead argue the issue is outside the scope of our review because the Tylers' purpose in excavating was a factual dispute resolved by the Board. The Board asserts "there were evidentiary disputes about whether or not the hole in the ground on the

Tylers' property was truly a 'well,' and whether its purpose was to obtain groundwater or merely to frustrate Teton's permit."

[¶14.] We agree that the existence of a well within the setback presented a factual dispute for the Board to resolve. At the hearing, in response to Kathy Tyler's presentation, one of Teton's representatives asserted the Tylers excavated for the sole purpose of frustrating Teton's application. Considering the well completion report offered by Kathy Tyler indicated the excavation had been completed on the same day that Teton submitted its application, the Board could have considered the timing of the excavation—though circumstantial—to support Teton's assertion that it was meant to frustrate the application. According to the hearing's minutes, Teton's engineer also told the Board he "made some calls" and was told a hole is considered a well "when it is grouted and the casing is developed and installed and the stem is down in the well." He told the Board that the Tylers' excavation did not meet any of these requirements at the time Teton submitted its application. Although the parties now dispute the existence of a well within the context of the statutory definition provided by SDCL 46-1-6(18), we see nothing in the ZOGC to suggest the Board was bound by this definition in its decision to approve Teton's application.

[¶15.] Nevertheless, GCCC maintains that "[i]t was undisputed that there was an artificial opening in the ground, made by means of an artificial method, which obtained groundwater[,] . . . within 2,640 feet of the proposed CAFO." While this statement is true, GCCC has materially misstated the statutory definition of the word *well* that it originally invoked. SDCL 46-1-6(18) says "for the purpose of

obtaining groundwater" and not "which obtains groundwater."[4]  While there does not seem to be any dispute that the Tylers claimed some amount of water from their excavation, the record clearly reflects a dispute as to their motivation in excavating. Thus, GCCC's claim that "Respondents do not and cannot dispute that a well existed within the setback" is flatly incorrect.

[¶16.]        Nor are we persuaded by GCCC's analysis of the underlying purpose behind the ZOGC.  GCCC asserts that "the Ordinances do not allow for any exceptions to the well setback requirement" and that "[t]he purpose of the well setback requirement is to prevent pollution to groundwater."  These assertions seem to be contradicted by the ZOGC.  Section 1304(6) specifically excludes wells owned by the operator of the CAFO from the setback requirement.  If GCCC's theory of the purpose behind the ZOGC is correct—i.e., the purpose is to prevent pollution from *entering* groundwater—it would make little sense to be concerned with a well on another property a half mile away, yet not be concerned about polluting groundwater at the center of waste production.  Considering this exclusion, the more likely purpose behind the setback requirement seems to be to prevent the disruption of existing water supplies to the neighbors of a proposed CAFO.

[¶17.]        We are satisfied that the Board regularly pursued its authority with respect to approving the application despite the Tylers' claim that they dug a well

---

4.        GCCC asserts that "[t]he phrase 'for the purpose of obtaining groundwater' relates to the opening in the ground."  We disagree.  The phrase "*for* the purpose of obtaining groundwater," like the phrase "*by* means of digging . . . or by any other artificial method," relates to the verb *made.  See* SDCL 46-1-6(18) (emphasis added).  Regardless, there is no distinction material to this dispute between the purpose of an opening in the ground and the purpose of making the opening in the ground.

within the setback. While it is undisputed that the Tylers excavated on their property on December 18, 2012, it is apparent from the record that the excavation's status as a well has been in dispute since at least the time of the hearing. Not only was the purpose of the excavation in dispute, Teton's engineer also challenged its status from a mechanical perspective. Because "[c]ertiorari cannot be used to examine evidence for the purpose of determining the correctness of a finding[,]" *Elliott*, 2005 S.D. 92, ¶ 14, 703 N.W.2d at 367 (quoting *Hines v. Bd. of Adj't of City of Miller*, 2004 S.D. 13, ¶ 10, 675 N.W.2d 231, 234), we do not decide whether we would have reached the same conclusion as the Board. We decide only that the Board regularly pursued its authority on this issue.

*Manure management and operation plan*

[¶18.]     GCCC asserts Teton's proposed manure management and operation plan did not meet the requirements of the ZOGC "because Teton significantly overstated the amount of land on which it could apply manure." According to GCCC, Teton entered into 16 contracts providing 2,461 acres of land in which to inject manure.[5] GCCC asserts, however, that "[h]alf of the contracts Teton identified include land on which drainage exists" and that "some of the contracts were either signed by an unauthorized person, overstated the actual amount of land provided," or were otherwise incapable of accepting manure. Thus, GCCC concludes, "[t]he Board's failure to ensure Teton's manure plan complied with the Ordinances demonstrates that it failed to regularly pursue its authority[.]"

---

5.     At the hearing, Teton's engineer told the Board that Teton had secured additional land in which to dispose of manure, bringing the total to approximately 3,500 acres.

[¶19.] We are not convinced that the Board failed to regularly pursue its authority on this issue. Although section 1304(10) of the ZOGC requires the application of manure to be set back from certain water sources and structures, an entire property is not rendered unusable by the presence of such setback. Even if the Board was required to accept as true GCCC's assertion that Teton overstated the amount of available land, GCCC offers no estimate of the true available acreage. Without doing so, claiming that Teton overstated the available acres is not synonymous with asserting the true number of available acres was insufficient. Furthermore, section 1304(4) offers little in the way of specific requirements for a manure management and operation plan.[6]

---

6. Section 1304(4) of the ZOGC states:

> Classes A, B, C, and D Concentrated Animal Feeding Operations must submit a Manure Management and Operation Plan.
>
> A. Plan must include:
>
> > 1. The location and specifics of proposed animal manure facilities.
> >
> > 2. The operation procedures and maintenance of manure facilities.
> >
> > 3. Plans and specifications must be prepared or approved by a registered professional engineer, or a Natural Resource Conservation Service (NRCS) engineer. Waste treatment facilities will require inspection by an engineer and as-built plans to be submitted to the County Zoning Officer.
> >
> > 4. Animal manure shall not be stored longer than two years.
> >
> > 5. Manure containment structures shall provide for a minimum design volume of three hundred sixty-five (365) days of storage.
> >
> > 6. Producers shall keep records on manure applications on individual fields which document

(continued . . .)

[¶20.] Although GCCC does not attempt to quantify the true available acreage or assert such area was insufficient, it does assert that "Teton's application recognized the inadequacy of its manure plan, admitting that the CAFO would produce 169,226 pounds of phosphorus but that it only had enough land to account for 100,438 pounds of phosphorus." However, GCCC bases this claim on a "phosphorus and acreage assessment" included on page three of Teton's initial nutrient management plan.[7] This assessment does not address the capacity of available acres to absorb manure. Instead, and contrary to GCCC's representations, this assessment reports the total pounds of phosphorus "available for crops" at 169,226 and the total pounds of phosphorus "required by fields" at 100,438.

[¶21.] We are satisfied that the Board regularly pursued its authority with respect to approving the application despite GCCC's claim that Teton's manure management and operation plan failed to comply with the ZOGC. GCCC's claims

_____

(. . . continued)

> acceptable manure and nutrient management practices have been followed. These records shall include soils test results for surface two feet of soil, actual and projected crop yields, nutrient analysis of manure, and information about date, rate and method of manure applications for individual fields.
>
> B. As a condition of the permit, the County Board of Adjustment may require the producer to participate in environmental training programs and become a certified livestock manager.

7. A nutrient management plan is required by section 1304(3) of the ZOGC. This requirement is separate from section 1304(4), which requires a manure management and operation plan.

are far from undisputed and, consequently, are factual determinations properly resolved by the Board.

*Failure to give notice to Melrose Township*

[¶22.]     GCCC asserts Teton failed to give notice to Melrose Township. Section 1304(12) of the ZOGC is titled "Information Required for Class A and B Concentrated Animal Feeding Operation Permit." Section 1304(12)(K) requires, "Notification of whomever maintains the access road (township, county and state). Notification of public water supply officials." Melrose and Big Stone Townships are jointly responsible for maintenance of the access road. It is undisputed that Teton provided notice to Big Stone Township. The Board and Teton argue that whether Teton notified Melrose Township is irrelevant because it had actual notice. The hearing's minutes reflect that an individual named Milt Stengel, who spoke during the public comments portion of the hearing, stated that Melrose and Big Stone Townships had previously discussed the proposed CAFO and decided not to upgrade the access road. He also indicated that the Townships might not permit pipelines in the ditches, but that an attorney for one of the townships advised that individual land owners might permit pipelines to run within their properties. The hearing minutes do not seem to indicate whether Mr. Stengel spoke on behalf of either or both of the townships.

[¶23.]     We are satisfied that the Board regularly pursued its authority with respect to approving the application despite Teton's failure to directly notify Melrose Township of the proposed CAFO. GCCC's assertion that "Teton's failure to provide Melrose Township notice was a straightforward noncompliance with the

Ordinances" is not supported by the text of the ZOGC. Section 1304(12)(K) requires "[*n*]*otification of* whomever maintains the access road[,]" (emphasis added), not "notification [by the CAFO operator to] whomever maintains the access road." In other words, the ordinance did not require Teton to notify; rather, it required Melrose Township be notified. Regardless of whether or not Mr. Stengel spoke at the hearing as Melrose Township's representative, his uncontroverted statements to the Board provided a basis for it to conclude Melrose Township had actual notice. As noted above, we do not decide whether we would have reached the same conclusion, *Elliott*, 2005 S.D. 92, ¶ 14, 703 N.W.2d at 367 (quoting *Hines*, 2004 S.D. 13, ¶ 10, 675 N.W.2d at 234), only that the Board regularly pursued its authority in this regard.

*Nutrient management plan*

[¶24.]        GCCC asserts Teton's nutrient management plan did not meet ordinance requirements. During her presentation, Kathy Tyler asserted the CAFO would require 20,000 to 40,000 gallons of water per day and that "Teton failed to demonstrate the ability to obtain [this] level of water[.]" According to GCCC, the ZOGC's nutrient-management-plan requirement "plainly included the ability to secure sufficient water for the CAFO." This assertion is unsupported and, as such, is waived. *See* SDCL 15-26A-60(6); *Veith v. O'Brien*, 2007 S.D. 88, ¶ 50, 739 N.W.2d 15, 29. Section 1304(3) of the ZOGC, which states the purpose and requirements of a nutrient management plan, does not address the water requirements of a CAFO. From a review of that section, it appears the purpose of a nutrient management plan is to prevent the oversaturation of manure disposal land with certain nutrients

like nitrogen and phosphorus, which has nothing to do with whether a CAFO has secured a sufficient water supply for its operation.

*Due process*

[¶25.] GCCC asserts it was denied due process of law in several respects. First, GCCC asserts the Board provided inadequate notice of the hearing. According to GCCC, "[t]he notice grossly understated the size of the proposed CAFO, which made preparing a full and complete opposition to the application impossible and made those individuals living farther away from the CAFO less motivated to voice opposition." "To establish a procedural due process violation, a plaintiff must demonstrate that he has a protected property or liberty interest at stake and that he was deprived of that interest without due process of law." *Osloond v. Farrier*, 2003 S.D. 28, ¶ 16, 659 N.W.2d 20, 24 (per curiam) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir. 1999)). We have previously recognized that the notice and hearing requirements of chapter 11-2 "afford[] the affected landowners with the opportunity to formally voice their concerns and present evidence in opposition to opposed measures[.]" *Schafer v. Deuel Cnty. Bd. of Comm'rs*, 2006 S.D. 106, ¶ 13, 725 N.W.2d 241, 246. It is undisputed that the Board posted notice of the hearing according to this requirement. Therefore, the only question is whether the transposition of the number of finisher and nursery swine rendered that notice ineffective.

[¶26.] GCCC's argument is misconceived for several reasons. First, section 504(2) of the ZOGC simply requires: "Notice of hearing shall be published once ten (10) days prior to the hearing in a paper of general circulation in the area affected."

Apparently, under the ZOGC, the Board is not specifically required to provide the number and type of livestock to be housed at a proposed CAFO. Even so, the published notice clearly stated that the CAFO at issue was categorized as Class A—the largest possible classification. Further, the Board addressed the publication mistake at the beginning of the meeting, prior to discussing Teton's application. The minutes of the hearing do not reflect that either GCCC or Tyler raised any concerns or objected to the Board considering the application at that time. Although additional interested land owners *might* have attended or more vigorously objected if the mistake had not occurred, GCCC has not produced evidence of a single such individual. As it stands, both Tyler and GCCC—the actual appellants here—attended the hearing. Finally, GCCC's argument that the publication mistake made "preparing a full and complete opposition to the application impossible" is conclusory and meritless. The correct number of finisher and nursery swine was included in Teton's application, which GCCC had an opportunity to review prior to the hearing.

[¶27.] The cases cited by GCCC in support of this alleged deprivation of due process are not persuasive. GCCC first directs us to *Gas Mart Corp. v. Board of Supervisors of Loudoun County*, 611 S.E.2d 340 (Va. 2005). In that case, the Supreme Court of Virginia held that notice of a public hearing was inadequate because "[t]here [was] no description or summary of the content of those policies, and the notices [did] not indicate the particular areas of the County that would be affected by the proposed policies." *Id.* at 346. The hearing in question concerned proposed amendments to county zoning ordinances, rather than the consideration of

a conditional use permit.  In contrast to the ZOGC, which does not require specificity or any particular level of detail, Virginia state law actually required such notice to "contain a *descriptive summary* of the proposed action[.]"  *Id.* at 344 (quoting Va. Code § 15.2-2204(A) (2004)).

[¶28.]        GCCC also directs our attention to *Rockaway Shoprite Associates, Inc. v. City of Linden*, 37 A.3d 1143 (N.J. Super. Ct. App. Div. 2011), another case concerning proposed amendments to ordinances instead of a conditional use permit. In that case, the court held that notice of a hearing was inadequate because, "instead of the 'brief summary of the ordinance's main objectives and provisions' clearly and plainly mandated by the statute, the public notice merely advised that the zoning [was] being amended as to the properties identified by common name and by lot and block number."  *Id.* at 1150.  The court rejected the "general, standardized language" of the notice because it "provide[d] no real notice apprising the public of what exactly [was] being proposed."  *Id.*  In contrast, the published notification in the present case left no room to guess what was being proposed: a conditional use permit to construct a Class A CAFO housing 7,816 swine.

[¶29.]        GCCC also asserts it was deprived of due process because the Board and Grant County's zoning officer improperly restricted GCCC's access to Teton's application.  SDCL chapter 1-27 ensures public access to public records held by governmental agencies.  SDCL 1-27-1 provides:

> Except as otherwise expressly provided by statute, all citizens of this state, and all other persons interested in the examination of the public records, as defined in § 1-27-1.1, are hereby fully empowered and authorized *to examine* such public record, and *make memoranda and abstracts* therefrom during the hours the respective offices are open for the ordinary transaction of

> business and, unless federal copyright law otherwise provides, *obtain copies* of public records in accordance with this chapter.

(Emphasis added.) GCCC asserts that "the Board and the County Zoning Officer refused to allow [GCCC] to make copies." The Board counters that "[w]hile Petitioners were not permitted to take the Application off-site to copy, at no time were they denied access to the Application." GCCC's use of information contained in the application seems to confirm that GCCC did, in fact, have an opportunity to "examine such public record, and make memoranda and abstracts therefrom[.]" *See id.*

[¶30.] There are other problems with GCCC's argument. First, GCCC offers no supporting authority for the conclusion that it had a property or liberty interest in using the zoning office's equipment to make copies of Teton's application. More importantly, however, GCCC does not assert that it actually attempted to utilize statutory procedure to obtain these documents. "If an informal request is denied in whole or in part by the custodian of a document or record, a written request may be made by the requestor . . . ." SDCL 1-27-37. A written request either forces the custodian to respond or results in a default denial of the request. *Id.* A denial, however, triggers the requestor's right to "commence a civil action by summons or, in the alternative, file a written notice of review with the Office of Hearing Examiners." SDCL 1-27-38. There is nothing to indicate that GCCC pursued this avenue of relief or requested the hearing be postponed. GCCC "cannot complain of a violation of procedural due process when [it] has not availed [itself] of existing procedures." *Anderson v. Douglas Cnty.*, 4 F.3d 574, 578 (8th Cir. 1993). Therefore, GCCC has not "demonstrate[d] that [it had] a protected property or liberty interest

at stake and that [it] was deprived of that interest without due process of law." *Osloond*, 2003 S.D. 28, ¶ 16, 659 N.W.2d at 24 (per curiam) (quoting *Hopkins*, 199 F.3d at 975).

[¶31.] Third, GCCC asserts the five-minute limitation imposed on public commentators at the hearing was improper because "Teton was given an unlimited amount of time to present evidence and testimony." GCCC misunderstands what due process requires. "Due process requires adequate notice and an opportunity for meaningful participation." *Id.* ¶ 19 n.4, 659 N.W.2d at 25 n.4. GCCC has offered no authority for the conclusion that, under South Dakota law, "meaningful participation" is defined as "equal time."[8] Despite its claim that one of its members "was not permitted to present all of the information she desired at the hearing[,]" GCCC fails to actually articulate any such allegedly suppressed information, let alone assert that the exclusion of such information prevented GCCC from participating in a meaningful way. Furthermore, as the Board points out, GCCC was free to submit written information to the Board as well.

---

8. GCCC cites *People ex rel. Klaeren v. Village of Lisle*, 737 N.E.2d 1099 (Ill. App. Ct. 2000), for the proposition that "[t]he Board's time limitation was a straightforward suppression of opposition in violation of [GCCC's] due process rights." *Klaeren* holds little value to this dispute as the Illinois court construed Illinois statutes that provided extensive procedural safeguards to property owners in larger municipalities. *Id.* at 1109. The court, discerning a "legislative intent favoring greater flexibility in the smaller municipalities[,]" held that Illinois's statutory definition of the word *hearing* proscribed "[a] proceeding that incorporates an arbitrary time limit without consideration of the nature of the comments and their relevance to the factual issues presented[.]" *Id.* at 1110, 1113-14. GCCC has not directed our attention to any equivalent statutes in South Dakota. Even if we adopted the Illinois court's interpretation of Illinois's statute, GCCC has not argued that the Board failed to consider the nature of the comments.

-18-

*Fraud*

[¶32.]     GCCC asserts the Board's decision was based on fraudulent information and that "[t]he Board was put on notice of the fraud and inaccuracies during the hearing, yet made its decision nevertheless.  Knowingly making a decision based on fraudulent information is fraud in itself."  Thus, GCCC concludes, "[t]he Board's decision was the product of fraud[.]"  Citing *Lamar Outdoor Advertising of South Dakota, Inc. v. City of Rapid City*, 2007 S.D. 35, 731 N.W.2d 199, GCCC urges this Court to review the merits.  As the Board correctly points out, GCCC misreads *Lamar*.  "Courts must not review the merits of a petition or evidence for the purpose of determining the correctness of a finding, in the absence of a showing that *the Board 'acted fraudulently* or in arbitrary or willful disregard of undisputed and indisputable proof.'"  *Id.* ¶ 21, 731 N.W.2d at 205 (emphasis added) (quoting *Cole v. Bd. of Adj't of City of Huron*, 1999 S.D. 54, ¶ 10, 592 N.W.2d 175, 177).  Thus, *Lamar* does not say a review of the merits is appropriate when a board's decision is the product of fraud.  As indicated above, *Lamar* contemplates scrutinizing the decision of a board when the board itself acts fraudulently.  *Id.*

[¶33.]     Even if we agreed with GCCC's interpretation of *Lamar*, GCCC has fallen short of its burden of establishing fraud.  GCCC asserts the following:

> Teton presented inaccurate information about disposal of manure on contracted acres.  Specifically, Teton presented contracts signed by someone other than the owner of the property, contracts requiring injection of manure into lands with drainage (which is unlawful under Ordinances § 1304(10)), contracts with inflated acres, and contracts containing CRP land onto which manure cannot be applied.  Teton misrepresented the fact that independent farmers are involved with the CAFO operation and that the principals of the proposed CAFO operator have no stake in the CAFO venture, when there is commonality

of ownership. Teton misrepresented that the CAFO site is not densely populated, when that area is one of the most densely populated rural areas in Grant County.

There are a number of problems with these assertions. Generally, they are largely conclusory and unsupported. Additionally, GCCC relies on the statutory definition of *deceit*. SDCL 20-10-2(2) defines *deceit* as "[t]he assertion, as a fact, of that which is not true, *by one who has no reasonable ground for believing it to be true*[.]" (Emphasis added.) Even if we believe GCCC's assertions that these representations are false, GCCC has also failed to show Teton had no reasonable ground for believing them to be true.

[¶34.] Individually, GCCC's assertions have additional problems. As we discussed above, *see supra* ¶¶ 18-21, GCCC has not offered any assertion as to the true acreage available for Teton's manure disposal. Even if we accept its allegations as true, GCCC has not even asserted facts sufficient to conclude that the Board's decision relied on Teton's access to the overstated acres in approving the permit. Similarly, GCCC has not attempted to show that the Board relied on Teton's assertions regarding the involvement of independent farmers or the interests of the CAFO operator's principals in the venture. Finally, Teton's assertion that the CAFO site is not densely populated and GCCC's assertion that the site is "one of the most densely populated rural areas in Grant County" are not mutually exclusive. The former is an absolute measure of population density, while the latter is measured relative to Grant County, South Dakota; to assert the former is hardly an act of fraud, by any stretch of the imagination.

[¶35.] GCCC has not alleged that the Board itself acted fraudulently beyond its decision to accept certain information presented by Teton and to reject certain

information presented by GCCC. Even under GCCC's flawed reading of *Lamar*, it has failed to show that the Board relied on fraudulent information. Consequently, we may not review the correctness of the Board's decision.

*Environmental, community, and economic impact*

[¶36.] Finally, GCCC asserts the Board acted "arbitrarily or in willful disregard of undisputed and indisputable proof" when it approved Teton's application despite various environmental, community, and economic concerns. According to GCCC, sections 1300 and 1304 of the ZOGC required the Board to consider "air, surface water, ground water, aquifer, or land pollution." Section 1300 of the ZOGC is merely a statement of intent.[9] That section goes on to say, "The following regulations have been adopted to provide protection against pollution caused by manure from domesticated animals." *Id.* The entirety of Article XIII carries out the statement of intent; section 1300 does not require the Board to anticipate and specifically consider every potential environmental consideration an objector might imagine. Rather, the regulations that follow section 1300 provide the necessary environmental protection.

[¶37.] GCCC also asserts Teton's application lacked an odor control plan. Although such a plan is required by section 1304(5) of the ZOGC, GCCC's assertion is meritless. Section F of Teton's application—titled "Management Plan for Fly and Odor Control"—clearly sets forth Teton's plan for minimizing flies and odor. The application states that Teton will compost dead animals—a practice it asserts is odorless and regulated by the South Dakota Animal Industry Board. The plan also

---

9. Literally, the section is titled, "Intent."

states Teton's intent to plant a tree barrier as a visual buffer and to help curb the migration of potential odor. All of the animals are to be confined in barns—not open pits—and their manure stored in concrete pits underneath the barns. Finally, Teton also said, "A certified nutrient applicator will be employed to conduct NMP field operations with the direction to minimize any application during weekends, holidays, warm weather evenings, and calm-humid days." Ultimately, the Board granted the conditional use permit on the condition that Teton undertake discussions to "design, install and maintain the most effective bio-filter for the Phase 1 fans at the facility" and to plant trees "on the site as designed by the Conservation or NRCS specifications according to the most effective practices."

[¶38.] Finally, GCCC asserts the Board failed to consider the community and economic impacts of the CAFO. The Board found "[t]hat evidence presented at the hearing was sufficient to prove that the granting of the conditional use, with the conditions imposed by the Board, would not adversely affect the public interest." The Board's decision is not rendered arbitrary simply because it gave less weight to GCCC's concerns than it did to the anticipated economic gain of the project. We cannot substitute our own judgment for that of the Board, nor is GCCC entitled to relief simply because it would have decided differently.

[¶39.] 2. *Whether the circuit court erred in striking Tyler's affidavit.*

[¶40.] GCCC asserts the circuit court erred in its decision to strike Tyler's affidavit from the record. A circuit court that hears an appeal from a board of adjustment's decision has discretion to take additional evidence.

> *If* upon the hearing *it appears to the court* that testimony is necessary for the proper disposition of the matter, *the court may*

> take evidence, or appoint a referee to take such evidence as it may direct and report the evidence to the court with the referee's findings of fact and conclusions of law, which constitute a part of the proceedings upon which the determination of the court is made.

SDCL 11-2-64 (emphasis added). The operation of this statute—i.e., supplementing the administrative record on appeal—is clearly triggered by the court's determination of need, not by a party's. Even if the court determines there is such need, the statute vests discretion in the circuit court to admit—or not—any offered evidence. As usual, "[e]videntiary rulings made by the circuit court are presumed correct and are reviewed under an abuse of discretion standard." *Wangsness v. Builders Cashway, Inc.*, 2010 S.D. 14, ¶ 11, 779 N.W.2d 136, 140. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d 600, 603 (quoting *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850).

[¶41.]　　According to GCCC, "[b]ecause the [circuit court] identified Tyler's motivation as an issue that is necessary for the proper disposition of the matter, the [circuit court] should have taken evidence concerning the same[.]" According to GCCC, "the Circuit Court was under the impression that it did not have a choice to accept the affidavit into the record." GCCC misunderstands the circuit court's ruling.[10] The circuit court stated its reason for granting the motion at the motion hearing, where it said:

---

10.　　In its brief, GCCC states: "[T]he Circuit Court's rationale for striking the Tyler Affidavit is puzzling."

> [T]he additional evidence which has been submitted I think could be received to assist the Court in determining whether the procedure was legally sufficient before the Board, but by opening it up to being heard for the purpose of deciding the merits of the case converts this from a certiorari review to a de novo review . . . .

The circuit court's meaning is clear when viewed in the context of a certiorari review. The circuit court, like this Court, was limited to reviewing whether the Board regularly pursued its authority. SDCL 21-31-8. Although the information contained in the Tyler affidavit *might* have helped resolve the question of the Tylers' motivation in digging the excavation on their property—a question which goes to the merits of the underlying controversy between the parties—the circuit court concluded the affidavit was not necessary to determine whether the Board regularly pursued its authority in regard to GCCC's assertion that a private well was located within the setback required by the ZOGC. Based on our discussion of the same, *see supra* ¶¶ 13-17, we cannot conclude that the circuit court's decision was "outside the range of permissible choices[.]" *Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d at 603 (quoting *Gartner*, 2014 S.D. 74, ¶ 7, 855 N.W.2d at 850). Therefore, the circuit court did not err in striking Tyler's affidavit.

**Conclusion**

[¶42.]	GCCC has not presented any "undisputed and indisputable" facts that the Board ignored; the Board's disagreement with GCCC as to the weight of its presented evidence does not mean that the Board acted arbitrarily. We see nothing in the record to suggest that the Board did not regularly pursue its authority. Therefore, we affirm on issue one. Because the circuit court did not abuse its discretion in striking Tyler's affidavit, we also affirm on issue two.

-24-

[¶43.]        ZINTER, SEVERSON, WILBUR, and KERN, Justices, concur.